UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

JAMES S.,[1]

      Plaintiff,

v.                                Civil Action No. 4:23cv139

MARTIN O'MALLEY,[2]
*Commissioner of Social Security,*

      Defendant.

### REPORT AND RECOMMENDATION

Plaintiff James Brandon S. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act. Plaintiff argues that the Commissioner's administrative law judge ("ALJ") incorrectly weighed opinion evidence from his treating physicians and improperly discredited his subjective complaints of pain. As a result, he argues that the ALJ's residual functional capacity ("RFC") is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.
[2] Since the filing of the case, Martin O'Malley was appointed the Commissioner of Social Security. He is therefore automatically substituted as a party pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence and therefore RECOMMENDS that the court AFFIRM the final decision of the Commissioner.

## I.    PROCEDURAL BACKGROUND

On March 25, 2021, Plaintiff initially filed for DIB and SSI (R. 10) alleging disability beginning November 17, 2016 (R. 73-74, 197-200) based on cervical degenerative disease, insomnia, and anxiety. The state agency denied his application initially and on reconsideration. (R. 142-51, 154-61). Plaintiff then requested an administrative hearing, which was held on April 6, 2023. (R. 40-72). Counsel represented Plaintiff at the hearing,[3] and a vocational expert ("VE") testified. Id.

On May 1, 2023, the ALJ denied Plaintiff's claims for DIB and SSI, finding he was not disabled during the period alleged. (R. 14-39). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20). Although he could not perform

---

[3] Plaintiff was represented by Lori E. Lemback, a non-attorney representative, and Grant Felbaum, an attorney, represented him at the hearing. (R. 17). Plaintiff has since retained local counsel, as reflected in the Complaint. (ECF No. 1).

past relevant work, the ALJ found that Plaintiff could perform work within the national economy. (R. 31-32). On September 28, 2023, the Appeals Council denied Plaintiff's request for review. (R. 1-7).

On November 13, 2023, Plaintiff filed his complaint in this court. Compl. (ECF No. 1). Plaintiff seeks judicial review of the Commissioner's final decision that he was not entitled to an award of DIB or SSI, claiming that "the denial of h[is] disability claim is not supported by substantial evidence . . . and therefore the denial of his claim should be reversed or remanded for further administrative proceedings." Id. at ¶ 6. On January 31, 2024, Plaintiff moved for judgment on the pleadings. (ECF No. 9). Plaintiff argues that the case should be reversed or remanded because the ALJ incorrectly evaluated relevant medical opinion evidence and failed to properly evaluate his subjective complaints of pain. Plaintiff's Memorandum ("Pl.'s Mem.") (ECF No. 9, at 21-31). On March 1, 2024, the Commissioner opposed Plaintiff's brief and filed a Memorandum in Support of the decision. (ECF No. 10). The Commissioner argues that the ALJ adhered to the controlling regulations when determining the persuasiveness of the medical opinions and evaluating Plaintiff's testimony, and that the resulting RFC is supported by substantial evidence. Defendant's Memorandum in Supp. Commissioner's Decision & Opp'n Summ J. ("Def.'s Mem.") (ECF No. 10, at 17-30). Plaintiff replied.

3

("Pl.'s Reply") (ECF No. 11). After a review of the record, this Report considers the parties' arguments.

## II.  **FACTUAL BACKGROUND**

Plaintiff was born in 1975, and at the time of the alleged onset in 2016 he was 40 years old. (R. 49-50). At the time of the ALJ's decision on his current claim for benefits, he was 48 years old, but still classified as a "younger individual" under the regulations. (R. 31-32); see 20 C.F.R. §§ 404.1563, 416.963. Plaintiff meets the insured status requirements under the Social Security Act until December 31, 2020. (R. 19). He has not engaged in substantial gainful activity since November 17, 2016, the alleged onset date. Id. He has a 10th grade education, and reported past work as an electrician's helper, equipment operator, and boat driver. (R. 49, 51-55).

### A.  **Plaintiff's Health Treatment**

Although the ALJ considered other medical opinions, Plaintiff's claims in this court focus primarily on medical opinions from Dr. Kim and Dr. Roberts, regarding his need for unscheduled breaks, unscheduled absences, and highly restrictive limitations on sitting and standing. Thus, the summary below largely focuses on the treatment notes and opinions from these two providers and their support staff.

On March 9, 2016, Plaintiff was evaluated by orthopedic surgeon Joseph Kim, M.D., for a history of low back pain and new

4

right leg pain over the past year. (R. 2318). Plaintiff previously received cortisone shots and was provided Tramadol for his pain. Id. The pain medication did not help his symptoms, and he was "hoping for something stronger." Id. Dr. Kim declined to recommend narcotic pain medication to treat chronic pain because it "generally leads to an increase in the narcotic requirements." Id. Plaintiff had not tried physical therapy. Id.

On examination, Plaintiff was "very pleasant," despite "mild distress," and his mood and affect were appropriate. Id. His motor, sensory and reflex exams were non-focal, but his lumbar spine was mildly tender. Id. Dr. Kim reviewed Plaintiff's x-rays from December 2015, which showed degenerative changes at L4-5 with decreased disc space and chronic changes of a mild compression deformity at L5. Id. Dr. Kim noted that Plaintiff fractured his lower back as child, and this injury was "probably related to the compression deformity at L5." Id. Dr. Kim diagnosed Plaintiff with lumbar radiculitis. Id. Plaintiff reported his pain as severe, and Dr. Kim referred Plaintiff for an MRI. Id. Dr. Kim stated he would "likely set [Plaintiff] up for an epidural injection," and that Plaintiff "understands the treatment options that doctors have for treating chronic pain which include non-narcotic pain medications versus physical therapy versus injections versus surgery as the last resort." Id. Dr. Kim

prescribed Plaintiff Diclofenac, Flexeril, and Tramadol and referred him to physical therapy. (R. 2319).

On March 14, 2016, Plaintiff had a lumbar spine MRI that showed discogenic marrow degenerative changes, facet arthropathy, disc desiccation, a mild broad-based protrusion extending to the left neural foramen more than the right, and severe left foraminal stenosis at L4-L5; and facet arthropathy, disc desiccation, and severe left foraminal stenosis and mild right foraminal stenosis at L5-S1. (R. 1536-38).

In April and May, 2016, Plaintiff had three epidural steroid injections ("ESIs"). (R. 305-20). After his third injection, on May 25, 2016, Plaintiff returned to Dr. Kim and reported "transient relief." (R. 2315). Dr. Kim's notes include that Plaintiff has had "severe low back pain . . . for a year and a half," he is "unable to live this way," and he has "trouble with normal activities of daily living." Id. Dr. Kim observed that Plaintiff's "main problem [was] low back pain," but he also experienced "some radiating right leg pain." Id. Dr. Kim reviewed Plaintiff's MRI, and found lumbar neuroforaminal stenosis, lumbar degenerative disk disease, and lumbar radiculitis. Id. Dr. Kim observed that Plaintiff complained of "debilitating pain," but "[u]nfortunately . . . ha[d] a difficult surgical problem." Id. Dr. Kim opined that Plaintiff's pain was likely caused by his degenerative disk disease, and that his best surgical option was

"to restore the disk height." Id. This procedure would require "opening up the neuroforamina bilaterally with an indirect decompression by restoring the disk height with an anterior interbody spacer." Id. Dr. Kim noted that the surgery would also treat Plaintiff's "substantial lower back pain." Id.

Dr. Kim discussed the surgery with Plaintiff, and informed Plaintiff that "there are no guarantees." (R. 2316). Dr. Kim told Plaintiff he "can only make his pain better," but cannot "make him painfree." Id. Dr. Kim also noted there "is no guarantee [that he] will make his pain better," and that his "pain might get worse." Id. He informed Plaintiff of the risks of surgery, and Plaintiff decided to go forward with surgery because he felt he had "no option." Id. Plaintiff said he was "in too much pain to try therapy," and did "not want to take pain medication." Id. Dr. Kim stated that Plaintiff would need a back brace after surgery "for pain control and stability." Id.

On September 27, 2016, Dr. Kim performed Plaintiff's surgery, including an L4 through S1 anterior lumbar interbody fusion, placement of interbody biomechanical device at L4-L5 and L5-S1. (R. 340-41). Plaintiff was treated at St. Francis Medical Center as an inpatient through October 1, 2016. (R. 342-43). He was prescribed Flexeril, Dilaudid, and Toprol. (R. 343).

On October 20, 2016, Plaintiff was treated by Dr. Kim's Physician's Assistant, Jessica Womack, P.A., at OrthoVirginia.

(R. 2310). Plaintiff noted "some residual back pain," but his pain had improved since surgery. Id. On examination, he was pleasant, in no apparent distress, and his surgical incision was healing well. Id. His lumbar spine was non-tender, and his range of motion and strength in his bilateral lower extremities was normal. Id. Plaintiff's gait was normal with no foot drop, and his bilateral lower extremities were neurovascularly intact distally. Id. Plaintiff denied any numbness, tingling, weakness, or radicular pain. Id. P.A. Womack reviewed two new x-rays of Plaintiff's lumbar spine, which showed good position of his hardware and allograft at L4-S1. Id.

On May 9, 2017, nine-weeks after his surgery, Plaintiff had a follow-up appointment with P.A. Womack. (R. 2308). On examination, Plaintiff was in no apparent distress, his surgical incision was well-healed, his mood and affect were appropriate, his lumbar spine was non-tender, and he had a normal range of motion and strength in his bilateral lower extremities. Id. His motor and sensory exams were non-focal, and his bilateral lower extremities were neurovascularly intact. Id. He had a normal gait with no foot drop. Id. Plaintiff noted residual back pain and stiffness in the mornings, and during some mornings he experienced radiating pain down his right leg. Id. He denied any numbness, tingling, or weakness. Id. P.A. Womack reviewed new x-rays of Plaintiff's lumbar spine, which again revealed good

position of hardware and allograft at L4-S1.  Id.  Plaintiff was prescribed Prednisone, and if his radicular pain did not improve, PA Womack indicated that she would prescribe him Gabapentin.  (R. 2309).   P.A.   Womack   also   refilled   Plaintiff's   Percocet prescription.  Id.

On January 4, 2017, Plaintiff had an MRI that showed an internal anterior fixation and interbody graft placement at L4-L5 and L5-S1, subtle anterolisthesis at L4-L5 and L5-S1, and mild diffuse disc bulging in left foraminal region with moderate to severe left, and mild to moderate right foraminal narrowing at L4-L5.   The MRI also revealed other mild findings and interval progression of severe left and moderate right foraminal narrowing. (R. 1462-64).

Plaintiff   returned   for   treatment   by   P.A.   Womack   on October 20, 2017.  (R. 2302).  He reported low back pain, and right greater than left radicular pain with associated numbness and tingling that was exacerbated by activity.   Id.  P.A. Womack prescribed Valium and Ultram (Tramadol).   Id.   On examination, Plaintiff had no spine tenderness, a normal range of motion in the bilateral lower extremities, 5/5 strength in the bilateral lower extremities, a negative straight leg test, and a normal gait with no foot drop.  Id.  Plaintiff was alert, and his mood and affect were appropriate.  Id.

On November 15, 2017, Plaintiff had another lumbar spine MRI that showed anterior fusion hardware and disc prosthesis located within L4-L5 and L5-S1, partial osseous ankylosis of the L5-S1 vertebral bodies more than L4-L5, likely chronic Grade 1 anterolisthesis of L5-S1, likely chronic L5 spondylosis, and other findings consistent with the January 2017 imaging. (R. 2300-01).

On January 23, 2018, Plaintiff had additional epidural spinal injections. (R. 2298). Plaintiff had a follow-up appointment with Dr. Kim on May 23, 2018, and he reported continued low back and bilateral leg pain. (R. 2295). His symptoms were exacerbated by activity, and he reported no relief from pain management or physical therapy. Id. On examination, Plaintiff was in no acute distress, his mood and affect were appropriate, and he was alert and cooperative. Id. Plaintiff had no lumbar spine tenderness, grossly symmetric range of motion bilaterally, and his motor, sensory, and reflex exams were non-focal. Id. Dr. Kim observed that Plaintiff had an antalgic gait. Id. Dr. Kim reviewed Plaintiff's most recent MRI, and noted that Plaintiff had failed conservative treatment measures. (R. 2296). Plaintiff decided to proceed with surgical intervention, and Dr. Kim scheduled a second lumbar spine surgery at L4-S1. (R. 2296-2297).

On July 17, 2018, Dr. Kim performed a laminectomy, partial facetectomy, and foraminotomy of L4 and L5, laminectomy of S1, posterolateral fusion at L4-L5 and L5-S1, and instrumentation,

allograft, and autograph with stem cells. (R. 2285-2287). On July 21, 2018, four days after his surgery, Plaintiff was discharged from Bon Secours Hospital after making "excellent progress with physical therapy." (R. 2274-75). Plaintiff was prescribed Flexeril and Dilaudid. (R. 2274-2275).

The following month, on August 1, 2018, Plaintiff had a post-op appointment with PA Womack. (R. 2267). He reported residual back pain and radicular thigh pain, but improvement compared to before his operation. Id. Plaintiff's gait was steady with no foot drop. Id. On examination, Plaintiff's mood and affect were appropriate, his lumbar spine was non-tender, his range of motion in his lower extremities was grossly symmetric and his strength was normal, and he had mild left calf swelling and tenderness. Id.

On October 12, 2018, Plaintiff was seen by PA Womack and reported residual stiffness in the morning, low back soreness/pain, and continued intermittent left lower leg swelling that waxes and wanes. (R. 2264). Plaintiff denied numbness, tingling, weakness, and radicular leg pain. Id. On examination, his bilateral lower range of motion was grossly symmetric, his bilateral lower extremity strength was normal, his motor, reflex and sensory exams were non-focal, and his gait was steady with no foot drop. Id. PA Womack observed that Plaintiff had mild left

calf swelling, but no posterior calf tenderness. Id. P.A. Womack refilled Plaintiff's Oxycodone prescription. (R. 2265).

On March 11, 2019, Plaintiff was treated by Primary Care Physician Kenneth Roberts, M.D. (721). Plaintiff last saw Dr. Roberts in 2009. Id. Plaintiff noted that he had spinal surgery in 2016 for lumbar spinal stenosis with L4-5 and L5-S1 fusion and laminectomy, and had developed problems with a tremor and hypertension. Id. Other than the tremor, Plaintiff denied any neurological complaints. Id. On examination, Plaintiff denied neck stiffness, joint pain, numbness, tingling, or loss of motor strength. (R. 723).[4] Dr. Roberts found no stiffness or swelling of Plaintiff's neck. Id. Plaintiff had full range of motion in his back, with no tenderness, spasms, or pain on motion. (R. 724). His motor strength was normal, with normal reflexes, station, and gait. Id.

In June 2019, Plaintiff had a follow-up appointment with Dr. Roberts for his hypertensions, hyperlipidemia, DJD (degenerative joint disease), obesity, prior elevated liver enzymes and tremor as well as other medical problems. (R. 813). Plaintiff noted that he was taking his medications, trying to follow his diet, and trying to remain physically active. Id. Plaintiff denied

---

[4] Plaintiff had right shoulder swelling, but he believed he "slept on it wrong" that past week. (R. 721, 723).

arthritic complaints and neck stiffness, his gait was normal, and he had no joint pain, stiffness, or swelling.  (R. 814).  On examination, Plaintiff's neck was supple, his extremities were unremarkable, he had an appropriate affect, and his neurological exam was unremarkable.  (R. 815).

On July 30, 2019, Plaintiff had a physical therapy evaluation at OrthoVirginia with Rebekah Bolden, DPT.  (R. 2258).  Plaintiff was evaluated for chronic lower back pain.  Id.  On examination, Plaintiff had tenderness to palpitation in the lumbar paraspinals, decreased muscle strength in the bilateral hips and knees measured at -4 to 4+ out of 5, and positive left slump test and straight leg raise test.  (R. 2259).

On August 23, 2019, Plaintiff returned to OrthoVirginia and was treated by P.A. Womack.  (R. 2253).  Plaintiff reported low back pain for the past week that radiates down to his left leg and top of his left foot.  Id.  Plaintiff started physical therapy the week prior, and had been walking and jogging.  Id.  On examination, Plaintiff had no lumbar spine tenderness, grossly symmetric range of motion in his bilateral lower extremities, 5/5 strength in his bilateral lower extremities, non-focal motor and sensory exams, and a steady but mildly antalgic gait with no foot drop.  Id.  That same day, Plaintiff attended physical therapy.  (R. 2251).  On examination, Plaintiff had a decreased range of motion in the upper lumbar spine.  (R. 2251).  Overall, plaintiff attended five

13

physical therapy sessions total, "and failed to return."   (R. 2246).  His last session was on September 9, 2019.  Id.

On October 10, 2019, Plaintiff was treated by Dr. Roberts. (R. 833).  Plaintiff had no neck stiffness, and was negative for gait disturbance, with no change of his chronic back and joint pain, joint stiffness, or joint swelling.  (R. 834).  Plaintiff noted that he remained physically active.  (R. 833).

On January 29, 2020, Plaintiff had an appointment with Dr. Kim.   (R. 2242).   He reported continuing lower back pain with radiating pain down his right leg.   Id.   Plaintiff reported experiencing these symptoms for several months, and his symptoms were exacerbated by activity.  Id.  He also noted mid-pack pain. Id.  On examination, Plaintiff's lumbar spine was tender, his straight leg raise test was positive, and his gait was antalgic. Id.  Dr. Kim ordered an MRI of Plaintiff's thoric and lumbar spine and referred Plaintiff to pain management for steroid injections. (R. 2243).

On February 19, 2020, Plaintiff was seen by PA Womack and described worsening mid-back pain for the past six months that radiated to his bilateral ribs and was exacerbated by activity. (R. 2239).  Plaintiff noted his low back pain was "not that bad," but he was experiencing "tingling in the top of his feet."  Id. On examination, Plaintiff was in no acute distress, had no thoracic spine tenderness, a normal range of motion in his bilateral lower

extremities, normal strength in his lower extremities, mild tenderness to left paraspinal musculature just below the level of the scapulas, and a steady gait. Id. Dr. Kim reviewed imaging that showed mild diffuse degenerative disc disease, no significant overall central canal stenosis, and mild right L4 and moderate L5 foraminal narrowing. (R. 2240). P.A. Womack reviewed Plaintiff's recent imaging, which showed postoperative and degenerative changes, no significant overall central canal stenosis, and mild right L4 and moderate bilateral L5 foraminal narrowing. (R. 2240). She found no significant overall central canal stenosis. Id. Plaintiff was diagnosed with thoracic radiculopathy and mid back pain and prescribed Valium. Id. P.A. Womack noted Plaintiff was a candidate for steroid injections. Id. She ordered an MRI of Plaintiff's thoracic-spine. Id.

On May 13, 2020, Plaintiff returned to his primary care physician, Dr. Roberts, who evaluated him and found that his hypertension was controlled with medication. (R. 891, 894). Plaintiff was negative that day for gait disturbance, joint pain, joint stiffness, or joint swelling. (R. 892). He had no neck stiffness, and no neurological complaints. Id.; (R. 891). Similarly, on June 19, 2020, Dr. Roberts examined Plaintiff and found he was in no acute distress, despite thoracic tenderness, was well developed, and his range of motion and gait were normal. (R. 601).

On July 20, 2020, Plaintiff was referred by Dr. Roberts to Bon Secours Neurology to evaluate Plaintiff's tremors. (R. 1069). Plaintiff's tremor was described as "very minimal," and Plaintiff stated he was satisfied with his current medication dosage and effectiveness at controlling his symptoms. Id. On examination, Plaintiff's gait was normal for his age. (R. 1072). The doctor informed Plaintiff that his "tremor will most likely slowly get worse with time" and that he will probably be a candidate for deep brain stimulation treatment. (1073).

The following month, on August 17, 2020, Dr. Roberts performed Plaintiff's annual physical examination and found he was in no distress, his neck was supple, his extremities were unremarkable, he had full motor strength, and normal reflexes, station, and gait. (R. 919). Plaintiff had mild diffuse discomfort on his cervical and thoracic spine, but no radiation. Id. He had full range of motion of his back, no tenderness, and no palpable spasm or pain on motion. Id. Plaintiff's annual examination was normal aside from his insomnia and mid thoracic, lumbar, and neck pain. (R. 920).

On September 9, 2020, Plaintiff was evaluated by Dr. Kim. (R. 604). He had no cervical spine tenderness, his upper extremity range of motion was grossly symmetric despite cervical irritability, and he had a normal gate. Id. Recent imaging of Plaintiff showed severe right neuroforaminal narrowing at C5-7 and

16

moderate neuroforaminal narrowing at C3-5.  (R. 605).  Dr. Kim recommended surgical intervention to treat Plaintiff's cervical pain.  Id.

On September 22, 2020, Plaintiff was treated in the emergency room after he stopped taking all of his medications for blood pressure and tremors.  (R. 530).  Plaintiff said he was taking a trip alone to the mountains for the next three days to go camping and fishing.  Id.

On September 28, 2020, during a pre-operative cardiovascular examination, Dr. Roberts found that Plaintiff's neck was supple, and he had no neck stiffness or swelling, but he had severe neck pain with intermittent tingling in his hands.  (R. 938).  Plaintiff had no joint pain, stiffness, or swelling, no numbness or tingling, unremarkable extremities, full motor strength, normal reflexes, gait, and station, and full range of motion in his back with no tenderness, spasm, or pain on motion.  (R. 938-39).

On October 5, 2020, Dr. Kim performed Plaintiff's cervical surgery—a C5 to C7 anterior discectomy and fusion with instrumentation and application of an interbody spacer at C5-C6 and C6-C7.  (R. 548).  Plaintiff was discharged the following day. (R. 551).  During a post-op appointment on November 4, 2020, Plaintiff reported left peri-scapular pain, with a pain level of 9/10.  (R. 607).  On examination, Plaintiff was pleasant, his mood and affect were appropriate, his neck incision was healing well,

his cervical spine was non-tender, he had a grossly symmetric range of motion and normal strength in his bilateral upper extremities, his bilateral upper extremities were neurovascularly intact, and he had a normal gait. (R. 607). Plaintiff denied radiating arm pain or numbness. Id.

The following month, on November 17, 2020, Plaintiff was treated again by Dr. Roberts. (R. 952). Plaintiff reported discontinuing all of his medications, and explained that "as long as he smokes marijuana his blood pressure is okay." Id. Plaintiff stated that his back was "much better since his surgery" and he can "drive about 3 hours" before his back starts to tighten up. Id. He reported continuing neck problems, and stated he was due for another neck surgery, but it had not been scheduled. Id. Plaintiff denied headaches, dizziness, or neurological complaints, and his examination findings were unremarkable. (R. 952, 955).

On December 30, 2020, Plaintiff was treated by PA Womack, and he reported slight improvement compared to before his operation. (R. 610). Plaintiff reported some left-hand numbness while driving, and bilateral peri-scapular pain that radiates down both of his arms. Id. On examination, his cervical spine was non-tender, range of motion was grossly symmetric in his bilateral upper extremities, strength was normal, and his gait was normal. Id.

On March, 23 2021, Plaintiff had a follow-up appointment with Dr. Roberts. (R. 987). Plaintiff stated that he remained physically active, and he had no arthritic complaints. Id. His examination findings were unremarkable, including no neck stiffness, gait disturbance, joint pain, nor muscoskeletal joint stiffness. (R. 989).[5]

On May 21, 2021, Plaintiff returned to Dr. Kim and reported 9/10 pain. (R. 2028). On examination, Plaintiff was in no acute distress, was alert, cooperative, and pleasant. Id. Plaintiff had cervical and lumbar spine tenderness, but his range of motion bilaterally was grossly symmetric. (R. 2028-29). His gait was stable. (R. 2029).

On June 4, 2021, Plaintiff had an appointment with his pain management provider at the Richmond Spine Intervention and Pain Center. (R. 2009). Plaintiff reported that his pain interferes with his activities of daily living, and he was experiencing numbness, tingling, and weakness. Id. Plaintiff rated his pain level a 10/10 at worse, and on average, a 9/10. (R. 2009-10). He reported up to 40% of symptom relief with medication. (R. 2009).

---

[5] From February to April, 2021, Plaintiff attended physical therapy at Carousel Physical Therapy. (R. 643-55). During his initial evaluation, Plaintiff reported temporary relief from his surgeries. (R. 643). Plaintiff noted that his pain interferes with his activities, but he "pushes through." (R. 643). Plaintiff stated he has difficulty checking blind spots and putting on socks. Id. Plaintiff was discharged from physical therapy in April, 2021, after reporting no improvement. (R. 652).

Plaintiff rated his current pain a 9/10, but on examination was in no acute distress and had a normal affect.   (R. 2009-111). Plaintiff had no muscle atrophy in his neck or back, normal cervical range of motion and alignment, full motor strength, normal reflexes, and normal sensation except for decreased sensation in his radial forearm, thumb, and index finger.  (R. 2011).

The following month, on June 6, 2021, Plaintiff was treated by Dr. Kim.   (R. 2025).   On examination, he was in no acute distress, but had cervical and lumbar spine tenderness.  Id.  His gait was antalgic, and his left grip reflex exam was a 4/5.   Id. Plaintiff's neck and lumbar spine range of motion were grossly intact.  Id.

On July 9, 2021, Dr. Roberts observed that Plaintiff was negative for gait disturbance, joint pain, and joint stiffness. (R. 2059-60).  Plaintiff had no neck stiffness, and no neurological complaints.  (R. 20159).  Id.  He reported arthritic complaints with back and neck pain.  Id.  Later, in September 2021, Dr. Roberts performed Plaintiff's annual physical examination, and observed that Plaintiff was in no distress, his motor strength was 5/5, he had full range of motion in his back, no back tenderness, and no joint tenderness.  (R. 2056-57).  His station and gait were normal.  (R. 2057).  Plaintiff had no arthritic complaints, and he was taking his medicine and trying to diet but knew "he could do better."  (R. 2054).  Dr. Roberts concluded that Plaintiff's annual

physical exam was normal, his hypertension was controlled, his insomnia was stable, and Plaintiff's benign essential tremor was stable. (R. 2057).

On November 24, 2021, Plaintiff was evaluated by Dr. Kim. (R. 2178). Plaintiff was well developed, pleasant, in no acute distress, and his mood and affect were appropriate. Id. Plaintiff's cervical range of motion was irritable, but he had no cervical spine tenderness, grossly symmetric range of motion in his neck bilaterally, normal motor, sensory, and reflex examinations, and his Hoffman signs were negative. Id. Plaintiff's lumbar spine was not tender, his lower extremity range of motion was grossly symmetric, his strength was normal, and his gait was steady with no foot drop. Id.

The following month, on December 13, 2021, Plaintiff had an appointment at the Richmond Spine Intervention & Pain Center, and reported that he was unable to perform his activities of daily living. (R. 2134). However, on examination, Plaintiff had a normal affect, a healthy appearance, no muscle atrophy in his neck, normal cervical spine alignment and range of motion, no cervical spine tenderness, and full cervical motor strength. Id. His straight leg raise was positive, but his sensation was intact except for decreased sensation in his radial forearm, thumb, and index finger. (R. 2135). Plaintiff's medications were adjusted. (R. 2136).

On February 7, 2022, at VCU Health, Plaintiff had a psychological evaluation in conjunction with consideration for a spinal cord stimulator—or other implantable pain device—as an alternative to surgery. (R. 2552). Plaintiff reported smoking marijuana several times a day since he discontinued opioids in August, 2021, and "he is not in a regular exercise program but tends to stay pretty active." Id. Plaintiff reported being "independent with activities of daily living and driving." (R. 2553). Plaintiff was recommended for consideration for spinal cord stimulation. (R. 2556).

On February 22, 2022, Plaintiff had an appointment at OrthoVirginia and complained of 10/10 low back pain since falling while getting out of his truck three weeks prior. (R. 2174). Plaintiff denied numbness, tingling, weakness, or radicular symptoms. Id. Plaintiff noted that he self-medicates with marijuana to help alleviate his low back pain. Id. The provider ordered three x-rays, and noted that they still showed good position of his lumbar fusion without complications. (R. 2175). On March 11, 2022, Plaintiff saw Dr. Kim and his pain level was a 5/10. (R. 2171).

In May, 2022, Plaintiff had an appointment with Dr. Roberts for abdominal pain. (R. 2408). Plaintiff denied a history of trauma or falls, headaches, and dizziness. Id. He denied gait disturbance and swelling. (R. 2409). On examination, his neck

was supple, and his extremities were unremarkable except for right elbow pain. (R. 2411).

On July 11, 2022, Plaintiff reported back and leg pain to Dr. Greer at VCU Health. (R. 2547). On examination, he had full upper and lower extremity strength and intact sensation. Id. Dr. Greer recommended a microdiscectomy to treat Plaintiff's symptomatic L2-3 herniated disc. Id. Plaintiff had the recommended surgery exactly one month later. (R. 2483). The day after his surgery, his pain was well controlled, and he ambulated without difficulty. Id. On September 19, 2022, Plaintiff had a post-surgery follow-up appointment, and reported that his symptoms had "completely resolved," but he was experiencing right leg radicular pain. (R. 2539). He denied any motor deficitis in his hands or arms, and denied dropping items or gait instability. Id. On examination, Plaintiff had full strength in his upper and lower extremities, and his sensation was intact. Id.

On October 4, 2022, Plaintiff saw his pain management provider. (R. 2528). He was in no acute distress, his mood was normal, and he had no focal motor or sensory deficits. Id. His gait was mildly antalgic, but his lower extremity strength was normal bilaterally. Id.

The following week, on October 11, 2022, Plaintiff had his annual physical examination with Dr. Roberts. (R. 2612). Plaintiff reported a slow recovery from his back surgery in August.

(R. 2612). Plaintiff denied headaches, dizziness, or neurological complaints. Id. Plaintiff had arthritic complaints regarding his neck, but had no other major arthritic complaints. Id. He denied neck stiffness, swelling, numbness, tingling, or loss of motor strength. (R. 2614). On examination, Plaintiff was alert, well appearing, and in no distress. (R. 2615). He had no neck stiffness or swelling, and his motor strength, reflexes, station, and gait were all normal. Id. His back had full range of motion with no tenderness, spasm, or pain on motion. (R. 2615). Overall, Plaintiff's annual physical examination was normal except for chronic back pain. Id.

On November 14, 2022, during a follow-up appointment with Dr. Greer at VCU Health, Plaintiff reported complete resolution of his radicular groin pain following the microdiscectomy. (R. 2516). However, Plaintiff reported unresolved leg pain on the right side. Id. He denied any weakness, but noted discomfort while sleeping due to neck and arm pain. Id. Plaintiff had full strength in his upper and lower extremities bilaterally. Id.

On January 12, 2023, at VCU Health, Plaintiff had elective C5-7 laminectomies and C5-T1 posterior cervicothoracic fusion to address his neck pain. (R 2658). He was discharged on January 17, 2023, in stable condition. Id.

**B.   Check-Box Opinions by Plaintiff's Treating Providers**

Dr. Kim and Dr. Roberts provided check-box medical opinions on Plaintiff's behalf in connection with his application for benefits.

**1.   Joseph Kim, M.D.**

On February 4, 2021[6], Dr. Kim completed a check-box questionnaire, noting he first treated Plaintiff on March 9, 2016, and last treated Plaintiff on January 21, 2021. (R. 469). Dr. Kim indicated that "patients ongoing impairments [are] expected to last at least 12 months." Id. Dr. Kim stated that Plaintiff's primary symptoms are current and ongoing back pain, including nerve pain, sharp, tingling, burning and numbness in the cervical, thoracic, and lumbar spine. (R. 470). Dr. Kim noted that Plaintiff's pain is constant and ongoing. Id. Dr. Kim listed activities that precipitate and/or aggravate Plaintiff's pain including "driving, walking, sitting period of time, [and] standing." Id. Dr. Kim noted that Plaintiff had surgery in 2016, 2018, and 2020, and he participated in physical therapy and received injections. Id. With respect to physical limitations described on the form, Dr. Kim checked the most extreme measure in every category, concluding that Plaintiff could perform a job in

---

[6] Dr. Kim dated the form February 4, 2020, but the surrounding documentation makes clear the document was actually prepared in February 2021. (R. 473-75).

a seated position for only one hour in an 8-hour workday, and could perform a job standing and/or walking for one hour in an eight-hour workday. (R. 471). Dr. Kim stated that it is medically necessary for Plaintiff to avoid continuous sitting in an eight-hour workday, and the Plaintiff must get up and move around from a seated position 10-30 times per day. Id. He stated that Plaintiff would require ten minutes to an hour before returning to a seated position. Id. Regarding Plaintiff's ability to lift and carry, Dr. Kim concluded that Plaintiff could never lift or carry any weight. (R. 471). He also checked boxes to indicate that Plaintiff can never or rarely grasp, turn, and twist objects, use his hands/fingers for fine manipulation, and use his arms for reaching (including overhead). (R. 472). Dr. Kim noted that Plaintiff's symptoms would likely increase in a competitive work environment, and in an eight-hour workday, Plaintiff would frequently experience pain, fatigue, or other symptoms. Id. Dr. Kim stated that Plaintiff would need to take 30 unscheduled breaks at unpredictable intervals during an 8-hour workday, would require 1-5 days to rest before returning to work, and would likely be absent more than three times per month because of his impairments or treatments. (R. 472-73). In each of these limitations Dr. Kim checked boxes corresponding to the most extreme limit defined by the question. Finally, Dr. Kim indicated that the functional limitations described in his questionnaire were reasonably

consistent with the clinical and/or objective findings discussed in the report. (R. 473). Dr. Kim stated Plaintiff's symptoms and related limitations described in the questionnaire apply as far back as March, 2016. Id.

### 2.   Kenneth Roberts, M.D.

On September 13, 2022, Dr. Roberts also completed a check-box multiple impairment questionnaire for Plaintiff on a form provided by his attorney. (R. 2490). Dr. Roberts stated that Plaintiff's impairments include degenerative disc disease, spondylolisthesis lumbar region, osteoarthritis involving multiple joints, cervical stenosis of spinal canal, chronic midline thoracic pain, and spinal stenosis. Id. He noted that he expects Plaintiff's impairments to last at least 12 months. Id.

Dr. Roberts stated that Plaintiff's primary symptom is pain, including constant neuropathic pain in the back of his head that radiates to his feet and is aggravated by lifting, bending, twisting, and standing. (2491). Dr. Roberts concluded that Plaintiff could sit, stand, and/or walk less than one hour in an eight-hour workday, that Plaintiff would have to get up from a seated position every 10-15 minutes, and that he could never lift or carry any weight. (R. 2492). He also stated that Plaintiff could rarely use his hands to grasp, turn, or twist objects, or for fine manipulation, and he could rarely reach with either arm. (R. 2493). Dr. Roberts opined that Plaintiff would frequently

experience pain, fatigue, or other symptoms severe enough to interfere with his attention and concentration. Id. He stated that Plaintiff would need to take frequent unscheduled breaks, and he would miss more than three days of work per month due to his symptoms. (R. 2493-94). Dr. Roberts observed that Plaintiff's symptoms go as far back as July 1, 2015. (R. 2494).

## C.   Opinion Testimony

### 1.   State Agency Consultants

On November 24, 2021, state agency medical consultant William Humphries Jr., M.D., reviewed the medical record—including Dr. Kim's opinion—and formulated an RFC. (R. 82). Dr. Humphries noted that Dr. Kim's opinion "contrasts with the other evidence in the record, which renders it less persuasive." Id. Dr. Humphries found Plaintiff could occasionally lift/and or carry (including upward pulling) up to 20 pounds, frequently lift and/or carry (including upward pulling) up to 10 pounds, and had no other pushing or pulling limitations. Id. He found that Plaintiff could stand and/or walk for four hours and sit for about six hours in an eight-hour workday, and Plaintiff could occasionally climb ramps or stairs and balance, frequently stoop, kneel, crouch, and crawl, and never climb ladders, ropes, or scaffolds. (R. 82-83). He found that Plaintiff could frequently reach, handle, and finger, and concluded that he had no visual and communicative limitations. (R. 83). He noted Plaintiff should avoid moderate exposure to

extreme cold, noise, and vibration, and avoid all exposure to hazards such as machinery and heights. Id.

On April 27, 2022, state agency medical consultant William Rutherford, Jr., M.D., reviewed Plaintiff's medical records on reconsideration and formed an RFC assessment. (R. 107-108). He found that Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to ten pounds, and had no other pushing or pulling limitations. (R. 107). Plaintiff could stand and/or walk for a total of four hours and sit for about six hours in an eight-hour workday, and occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. Id. He concluded that Plaintiff had no manipulative limitations, and should avoid concentrated exposure to vibration and hazards. (R 107-108).

Of note, both agency examiners formulated their RFCs "based on an incomplete record," and the ALJ ultimately imposed greater limitations than those offered by the disability examiners because of the additional evidence. (R. 29).

Plaintiff also underwent a Consultative Exam by Dr. Nancy Powell on May 30, 2017. Dr. Powell noted Plaintiff's history of back surgery in 2016, and a history of a work-related accident pulling a cable. She stated Plaintiff was able to walk to the exam room and get on and off the exam table without difficulty. On leaving, she observed him "walking at a fast normal pace

including up a slight incline." R. 477. On examination she found he had a normal gait, and did not use assistive devices. His cervical range of motion and upper extremities were within normal limit. Id. Thoracic and lumbar spine, hips, and knees were all within normal limits. He had a negative straight leg raising test. Id. Dr. Powell observed no tenderness, swelling, spasm, or crepitus, and found 5/5 strength in both upper and lower extremities. He did have slightly decreased sensation on his right thigh. Id. She found at that time that Plaintiff could stand and walk for six hours with more frequent breaks and lift and carry 10 pounds due to back pain. She noted no manipulative or environmental limitations. (R. 423).

### D. Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on April 6, 2023. (R. 40-72). The ALJ also heard testimony from the VE, Rabia Rosen. (R. 24).

#### 1. Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that he is single and lives alone in a trailer home. (R. 48-49). Plaintiff stated he has three children—ages 23, 13, and 10. (R. 49). Plaintiff testified that he gained weight recently because he is unable to exercise. Id. He testified that he completed tenth grade of high school, and does not have a GED. (R. 49-50). Plaintiff noted he can read and do regular math, but can barely

write because of "tremors he has had since he was 16 years old." (R. 50). Plaintiff testified that he has a driver's license, and drives short distances (i.e., one to two miles) to town. Id. Plaintiff also noted that he drives to Richmond for doctor's appointments, which is "about an hour and a half," and he makes several stops to rest. (R. 50-51).

The ALJ then reviewed Plaintiff's work history and asked about his past experience. (R. 51). Plaintiff testified that his last job was at King Electric, and he hurt his lower back. Id. Plaintiff was an electrical helper and would "sweep up . . . help pull some wires . . . run and get tools . . . [and] hand them stuff." Id. Plaintiff's job duties included lifting and carrying between fifty and one hundred pounds, and for example, he would lift/carry bags of concrete. (R. 52). Plaintiff worked at King Electric for over one year. Id. Plaintiff also worked for G.L. Pruett Company in labor, including operating heavy equipment and ground grading. Id. Plaintiff worked full-time for G.L. Pruett for about "six months." (R. 53). Plaintiff also worked for Godsey and Sons as a heavy equipment operator. Id. Plaintiff stated he had the same types of duties at Godsey as he did at G.L. Pruett. Id. At Godsey, Plaintiff lifted and carried "50 to 100" pounds. Id. Plaintiff also worked at Delta Marine Construction as a boat operator. (R. 54). His duties included transporting individuals by boat to jobsites and lumber yards. Id. Plaintiff testified

that he did not have a boater's license, but he completed a boater's safety course.  (R. 54-55).  Plaintiff did not work at Delta Marine long because it was hard and involved heavy lifting, including dragging telephone poles.  (R. 55).  Plaintiff stated that he lifted and carried over 100 pounds.  Id.  Plaintiff also worked for Ward and Stencil Company operating heavy equipment, which was similar to his job at G.L. Pruett.  Id.

Plaintiff then discussed his medical issues.  (R. 57). Plaintiff stated that he feels like his "head is going to explode," because of pain traveling up his neck to his head.  Id.  Plaintiff explained that he has pain in his neck "every day and night," and the pain goes "up into" his head.  Id.  Plaintiff noted that the pain goes to his arms, but "[t]hat part is getting a little better because of this last surgery."  Id.  He nonetheless emphasized that the "pain is still there."  Id.  Plaintiff stated his last surgery was a cervical fusion on January 12, 2023.  Id.  Plaintiff testified that he still experiences, although less often, tingling and numbness in his hands, fingers, and arms.  (R. 58).  He noted that he may have another surgery on his neck to stop the pain. Id.  The ALJ asked Plaintiff if he had any relief after his first neck surgery in October, 2020, and Plaintiff stated that he did not.  (R. 58).

Plaintiff then discussed his mid and lower back pain, and explained that he has "[p]ain every day, and he walk[s] around

32

with one hand on [his] neck and one hand on [his] back." (R. 58).
Plaintiff testified that his pain is usually located in his lower
back, but since his neck surgery, he has experienced pain down his
left leg because he was "strapped to the table too hard during the
surgery." Id. Plaintiff stated he has pain in his lower back,
that goes down to his right leg and feet that is "pretty much
constant." (R. 58-59). Plaintiff noted that he has pain in his
left leg, but not the "electric shocks" he experiences in his right
leg. (R. 59).

Plaintiff testified that he had three surgeries on his lower
spine that did "absolutely nothing," but he also noted that the
third surgery "helped a whole lot." (R. 59). However, Plaintiff
stated that it has become "worse since then." Id. Plaintiff
explained that Dr. Kim would like to perform a new lower back
surgery, and take everything out and start over because "it was
too tight." (R. 59).

Next, Plaintiff testified about his activities of daily
living. Id. Plaintiff stated that on an average day, he can stand
for twenty minutes at a time and walk ten minutes. (R. 60).
Plaintiff also said he can sit for fifteen minutes in an office
style chair before needing to get up. Id. Plaintiff did not know
how much he could lift or carry, but he testified that he could
reach into his fridge, pull out a gallon of milk, carry it across
his kitchen, and set it on his counter. (R. 61). Plaintiff noted

33

that he could carry a gallon of milk in each hand, but he would experience neck pain.  Id.  Plaintiff stated he has "[a] little bit" of difficulty moving his head from side to side, and his "last surgery stiffened [him] up a little."  Id.  Plaintiff testified that he does not have as much difficulty raising his head or neck up and down.  Id.  During the hearing, Plaintiff put both of his arms straight above his head and straight out in front of him, and noted that he had some neck pain.  Id.  Plaintiff stated his hands are "[a]lways numb."  (R. 62).  Plaintiff clarified that before his recent surgery in January, he only had "[a] little bit" of difficulty with his hands, and they would "just get numb" and things would "just slop" or drop "sometimes."  Id.  Plaintiff stated he is "[u]ncomfortable no matter what" he does."  Id. Plaintiff explained that he has difficulty bending over, and it is hard for him to wash his feet, he is unable to put socks on, and he cannot tie a shoelace.  (R. 62-63).  However, he stated he makes quick meals for himself, and sits in a chair if he needs to while cooking.  (R. 63).  Plaintiff testified he is unable to "keep [] up" his home, and that his mom comes and helps him clean.  Id. Plaintiff stated that it is "just the standing up . . . And I'll get it started . . . I just can't ever finish anything."  Id. Plaintiff noted that he does his dishes and laundry, but both chores hurt because he has to "bend over," so he has a "little picker up and grabber" to assist.  Id.  Plaintiff goes to the

grocery store to shop, but does not stay long. (R. 64). Plaintiff stated that during the day, he looks out at the water, and does not watch TV or read. Id. Plaintiff stated he no longer goes fishing or camping. (R. 65). Plaintiff does not exercise but tries to go for walks. Id. He is unable to walk far because his legs, feet, back, neck, and "everything" hurt. Id. Plaintiff noted that his pain is worse some days, and he is unable to leave his home. Id. He stated this occurs seven days out of each month, where he is "laid up." (R. 66).

## 2. Testimony from the VE

The VE classified Plaintiff's prior work experience as electrician helper (DOT 821.667-010), heavy equipment operator (DOT 859.683-010), motorboat operator (DOT 911.663-010), and boat loader helper (DOT 911.687-010). (R. 66-67). The ALJ's hypothetical for the VE posited a person with the same age, education, and work experience as Plaintiff with the following limitations:

> Assume further this individual is limited to lifting and carrying up to ten pounds. The individual cannot push and pull. Individual can stand and walk up to four hours within an eight-hour workday, sit about six hours within an eight-hour workday, sit about six hours within an eight-hour workday. The individual can walk no longer than 15 minutes at a time, stand no longer than 30 minutes at a time, and sit no longer than 30 minutes at a time. The individual should be able to be allowed to change positions as needed while staying on task. The individual cannot crawl, kneel, and climb, but can perform other postural movements occasionally. The individual cannot do fast-paced tasks such as assembly

35

> line jobs involving production quotas.  The individual
> is limited to frequent fingering, grasping, handling,
> and reaching.    The individual cannot work around
> vibrations and hazards such as moving [] dangerous
> machinery a[t] protected height.

(R. 68).  The VE testified that this person would not be able to perform any of Plaintiff's past work.  Id.  However, the VE testified that the person could perform sedentary work, including as a surveillance system monitor (DOT 379.367-010), with 141,700 jobs nationally, addresser, envelopes (DOT 209.587-010), with 68,700 jobs nationally, call-out operator (DOT 237.367-014), with 47,750 jobs nationally.  (R. 67-68).  Following an additional query by the ALJ, the VE testified that no employer would tolerate more than 15% of time off task and the surveillance monitor would not permit any time off task.  (R. 69-70). As a result, the VE offered an additional job of lens inserter (DOT 713.687-026), with 241,000 jobs nationally).  All the identified employment would permit no more than 1.5 unexcused days absent per month.  (R. 70).

Plaintiff's representative then limited the RFC to occasional handling.  Id.  The VE testified that the person could still work as a call-out operator.  (R. 71). Finally, the VE testified in response to Plaintiff's representative that the individual could not work full-time if their ability to sit, stand, and walk did not equal a combined eight hours.  Id.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." <u>Craig</u>, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390; <u>see</u>

also <u>Lewis v. Berryhill</u>, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. <u>ANALYSIS</u>

Plaintiff's brief contends that the ALJ's findings are not supported by substantial evidence because he failed to correctly assess the persuasiveness of certain medical opinions from his treating physicians and improperly discredited his subjective complaints of pain. Pl.s Mem. (ECF No. 9, at 20-31). As explained below, this Report finds no error in the ALJ's analysis of the opinion testimony and other evidence. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

## A. Framework for SSA Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). Title XVI of the Act provides supplemental security income benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." <u>Bowen v. Galbreath</u>, 485 U.S. 74, 75 (1988)

(citing 42 U.S.C. § 1382(a)). As relevant here, the Act defines
"disability" as the inability to "engage in any substantial gainful
activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 42
U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), § 416.905(a).
An impairment renders an individual disabled only if it is so
severe as to prevent the person from engaging in his or her prior
work or any other substantial gainful activity that exists in the
national economy. See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B);
20 C.F.R. §§ 404.1505(a), 416.905(a).

SSA regulations set out a sequential analysis which ALJs use
to make their determination. 20 C.F.R. §§ 404.1520(a)(4),
416.920(a)(4). Specifically, the regulations direct the ALJ to
answer the following five questions:

1.  Is the individual involved in substantial gainful
    activity?

2.  Does the individual suffer from a severe impairment
    or a combination of impairments that meets the
    durational requirement and significantly limits his
    or her physical or mental ability to do basic work
    activities?

3.  Does the individual suffer from an impairment(s)
    that meets or equals a listing in 20 C.F.R. Pt. 404,
    Subpt. P, App. 1 (a "listed impairment") and meets
    the durational requirement?

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.  An affirmative answer to questions three or five establishes disability.  The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(3), 404.1520b, 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age."  Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ.  Hays v. Sullivan,

907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599

F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in

substantial gainful activity from his alleged disability onset

date until the hearing date.  (R. 19).  At step two, the ALJ found

that Plaintiff suffered from the following severe impairments:

disorders of the cervical, thoracic and lumbar spine, obesity and

hypertension.  Id.  At step three, the ALJ found that Plaintiff

did not suffer from a listed impairment or combinations of

impairments that met or medically equaled the severity of one of

the listed impairments.  (R. 20).  The ALJ developed a finding

regarding Plaintiff's RFC.  He determined Plaintiff was able

> to perform sedentary work as defined in 20 [C.F.R. §§]
> 404.1567(a) and 416.967(a) except the claimant is
> limited to lifting and carrying up to 10 pounds.  The
> claimant cannot push and pull.  The claimant can stand
> walk four hours and sit about six hours within an eight-
> hour workday.  The claimant can walk no longer than 15
> minutes at a time, stand 30 minutes and sit 30 minutes
> at a time.  The claimant requires changing positions as
> needed while staying on task.  The claimant cannot crawl,
> kneel, and climb, but he can perform other postural
> movements on an occasional basis.  The claimant cannot
> do fast-paced tasks such as assembly line jobs involving
> production quotas.  The claimant is limited to frequent
> fingering, grasping, handling and reaching.  The
> claimant cannot work around vibration and hazards such
> as moving dangerous machinery and unprotected heights.

(R. 22).  At step four, the ALJ concluded that Plaintiff could not

perform past relevant work.  (R. 31).  At step five, the ALJ found

work in the national economy that Plaintiff could perform and thus found that he was not disabled.  (R. 32–33).

## C. The ALJ's Evaluation of the Medical Opinions is Supported by Substantial Evidence.

Plaintiff argues that the ALJ failed to properly evaluate the medical opinion evidence provided by Dr. Kim and Dr. Roberts, and as a result, the ALJ's RFC is not supported by substantial evidence.  Pl.'s Mem. (ECF No. 9, at 22—30).  Specifically, Plaintiff contends that "ALJ's decision lacks any articulation for how he considered the supportive explanations provided for the opinions of the treating doctors."  Id. at 22.  Plaintiff also alleges that when the ALJ concluded "that the opinions from Drs. Kim and Roberts [were] inconsistent with the treatment record, [the] ALJ referred to some records documenting" normal findings, but failed "to grapple with other evidence documenting conflicting findings of an abnormal gait."  Id. at 23.  The Commissioner responds that the ALJ properly evaluated the medical opinion evidence and his RFC is supported by substantial evidence.  Def.'s Mem. (ECF No. 10, at 19).  Because the ALJ's overall evaluation is consistent with the controlling regulations, remand is not appropriate.

### 1. The ALJ considered the overall persuasiveness of Dr. Kim's and Dr. Roberts' medical opinions.

Under the rules, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical

opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

Here, when explaining his RFC determination, the ALJ stated that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." (R. 22). Then, the ALJ discounted Dr. Kim's and Dr. Roberts' medical opinions, finding them both not persuasive, because they were unsupported by Plaintiff's treatment records and inconsistent with the record as a whole. (R. 30-31). This finding is supported by substantial evidence in the record.

        **a.   The ALJ's evaluation of Dr. Kim's opinions is supported by substantial evidence.**

The ALJ's finding that Dr. Kim's opinion was not persuasive is supported by substantial evidence. (R. 30). Specifically, the

ALJ found that Dr. Kim's opinion was not consistent with his "own findings." Id. (citing Dr. Kim's treatment notes and examination findings at Ex. 9F, 17F, 21F, 22F, 28F). In addition to accurately citing Dr. Kim's unsupportive records by exhibit numbers, the ALJ explicitly identified inconsistencies between those cited exhibits, and his severe limitations. Id. For example, the ALJ observed that Dr. Kim's treatment notes concerning Plaintiff "show generally[7] normal physical exam findings including a steady gait, normal strength and tone, normal range of motion, and negative straight leg raise testing." Id.; see (R. 601) (observing in June 2020 that Plaintiff was in no acute distress, his range of motion was grossly symmetric, and his gait was normal); (R. 604) (finding in September, 2020, that Plaintiff had no cervical spine tenderness, grossly symmetrical bilateral range of motion, and a normal gait); (examining Plaintiff on January 21, 2021 and grossly symmetric range of motion and a stable gait). However, Dr. Kim concluded in his check-box opinion that Plaintiff could only sit and stand/walk for one hour during an eight-hour workday, never lift and carry any weight, be absent more than three days a month, and would require breaks every 10 to 15 minutes. (R. 30) (citing

---

[7] Although Dr. Kim did occasionally observe Plaintiff had an antalgic gait and other related issues, his treatment notes as well as his PA's treatment notes as a whole support the ALJ's finding. See (R. 587, 590, 594, 598).

R. 469-473).  Given the lack of support for Dr. Kim's check-box opinion in his own cited treatment notes, the ALJ adequately explained why he found Dr. Kim's opinion not persuasive.

The ALJ also explained that Dr. Kim's opinion was not consistent with other evidence in the record.  (R. 30-31).  The ALJ again observed and cited to exam findings throughout the record generally which "note normal gait, strength, tone, bulk, and sensation and normal straight leg raise testing." (R. 30) (citing Ex.'s 9F, 11F, 12F, 15F, 18F, 20F, 22F, 26F, and 28F).  The ALJ explained that Dr. Kim's restrictive opinion "depicts an individual that is essentially bedridden with no or rare use of hands and arms, no lifting and sit/stand/walk less than one hours." Id.

Citing out of circuit authority, Plaintiff complains that the ALJ wrongly concluded that Dr. Kim "described an individual who is 'bedridden,'" and this finding is "not supported by any evidence." (ECF No. 9, at 26).  But this mischaracterizes the ALJ's detailed explanation of his shorthand "bedridden" reference.  The ALJ understood that Dr. Kim had not made an erroneous finding that Plaintiff was literally bedridden.  He closely evaluated the opinion's specific limitations against the evidence in the record. And his description of Plaintiff as "essentially bedridden" merely highlights the fact that there was virtually no evidence of record to support a contention that Plaintiff could not use his hands or

arms, or that he could manage to sit only one hour in an eight-hour day.   The ALJ did not disregard the context of Dr. Kim's evaluation as Plaintiff contends.   He simply used the term hypothetically to observe that Dr. Kim's opinion was inconsistent with other evidence showing that Plaintiff regularly engaged in activities, and was not as severely limited as Dr. Kim's opinion evidence suggests.   Id. at 22, n7.   Notwithstanding Plaintiff's arguments to the contrary, the ALJ addressed the supportability and consistency of Dr. Kim's opinion as required by 20 C.F.R. § 404.1520c(b)(2).   The ALJ specifically observed that Dr. Kim's opinion was inconsistent with Plaintiff's daily activities, including reports that he jogged, walked, and went camping.

Importantly, the ALJ conceded that "these limitations [imposed by Dr. Kim] could be supported during [Plaintiff's] recovery from surgery, [but] they are not supported for a period of 12 continuous months."   (R. 30-31).   To qualify for Social Security disability benefits, an individual's health problems must "last, or be expected to last, for at least 12 months in a row." (R. 145).   The SS regulations do not require a claimant to suffer from a marked limitation every day of the year, and a severe impairment may be characterized by fluctuating symptoms, but, the claimant must show that their impairment is sufficiently longitudinal to meet the disability requirements.   See Evelyn B. v. Kijakazi, 2023 U.S. Dist. LEXIS 123469, at *12 (D. Md. July 17,

2023).  The ALJ relied on Plaintiff's longitudinal record which documents surgical intervention, periods of recovery, and resulting symptom relief, to find Dr. Kim's opinions were not supported by, or consistent with, the record evidence, and thus not persuasive.  (R. 31).

b.    **The ALJ's evaluation of Dr. Roberts' opinions is supported by substantial evidence.**

The ALJ's finding that Dr. Roberts' opinions were "not persuasive" is supported by substantial evidence.  (R. 31).  Again, the ALJ correctly applied the rules governing how such opinions must be evaluated.  With regard to supportability, he observed that Dr. Roberts' own exam notes show that Plaintiff had generally normal physical exams, including a steady gait, normal strength and tone, normal range of motion, and negative straight leg raise testing.  Id.; see (R. 724) (finding Plaintiff had a full range of motion in his back and normal gait); (R. 753) (observing a normal gait, no joint pain or stiffness).  Dr. Roberts often administered physical exams that resulted in unremarkable findings throughout the relevant period, and Plaintiff regularly denied experiencing gait disturbances, joint pain or swelling, and other neurological problems.  See (R. 834) ("negative for – gait disturbance, change of his chronic back and joint pain, joint stiffness or joint swelling"); (R. 859, 872) ("appropriate affect");  (R. 918-19) ("Positive for midthoracic as well as cervical pain," but "no

47

radiation," "[n]o joint pain, stiffness or swelling," "full range of motion [of back], no tenderness, palpable spasm or pain on motion); (R. 939) ("Back exam – full range of motion, no tenderness, palpable spasm or pain on motion," "no joint tenderness, deformity or swelling," "gait normal"); (R. 955, 990) ("appropriate affect"); (R. 2056) ("gait normal," "[b]ack exam – full range of motion no tenderness, palpable spasm or pain on motion," "no joint tenderness, deformity or swelling").

The ALJ explained that Dr. Roberts' opinion is also inconsistent with the other record evidence. (R. 31). The ALJ cited to exhibits in the Administrative Record which he stated generally showed "a steady gait, normal range of motion, normal strength, bulk, and tone, and negative straight leg raises." Id. (citing Ex.'s 9F, 15F, 17F, 22F, 23F, and 28F). Plaintiff does not dispute these citations, or their support for the ALJ's assessment—but argues the ALJ failed to "grapple with" contrary evidence in the record. Pl's. Mem. (ECF No. 9, at 27). This is not correct. The ALJ recognized that Plaintiff had a series of invasive surgeries to deal with his pain. He noted that Dr. Roberts' limitations could be supported for brief periods while recovering but not for periods of 12 continuous months. Id. (citing Exs. 9F, 1F, 12F, 15F, 18F, 20F, 22F, 26F, and 28F). Based on the foregoing, the ALJ properly found Dr. Roberts' opinion was

not supported by the record or consistent with the evidence of record.  Id.

**D.   The ALJ Properly Evaluated Plaintiff's Subjective Statements.**

Finally, Plaintiff argues that the ALJ improperly discounted his subjective statements, and this error runs afoul of Arakas v. Comm'r, SSA, 983 F.3d 83, 95 (4th Cir. 2020).  Pl.'s Mem. (ECF No. 10, at 28-30).  The ALJ found that Plaintiff's impairments could have caused the alleged symptoms, "however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. 23-24). He explained his conclusion and cited to substantial evidence which supports his finding.

In Arakas, the Fourth Circuit emphasized that, after the ALJ finds that the claimant's impairment could produce symptoms, the ALJ "may not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate them." Arakas, 983 F.3d at 95 (quoting SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *4-5 (Mar. 16, 2016)) (cleaned up).  But Arakas concerned a very specific diagnoses of fibromyalgia, a disease that the ALJ in that case misunderstood and only cursorily addressed.  See id. at 98; see also Donta J. v. Saul, No. 2:20CV131, 2021 U.S. Dist. LEXIS 123735, 2021 WL 2711467, at *3 (E.D. Va.

July 1, 2021) (distinguishing Arakas because the ALJ "listed the reasons for his decision"). In this case, Plaintiff has not been diagnosed with fibromyalgia. Instead, his complaints of pain relate to documented physical impairments in, among other things, his neck, back, hands, and knee. Moreover, as documented in this decision, the ALJ reviewed a detailed medical record demonstrating largely successful treatment of both his lumbar and cervical spine conditions. In assessing his testimony, the ALJ first provided a detailed narrative discussing Plaintiff's subjective complaints:

> During the hearing, the claimant testified that he lives in a trailer. He is single and has three children, ages 23, 13 and 10. He is 5 feet 8 inches tall and weighs 250 pounds. His usual weight is between 200 and 220 pounds. He has gained weight because he is not able to exercise. He completed tenth grade. He can read. He has tremors that affect his ability to write. Pain prevents him from driving, but he drives to town and back. At King Electric, he was a helper. At GL Pruett, he was a heavy equipment operator for maybe six months. He feels like his head is going to explode. He cannot think straight. He cannot send a text message without making mistakes. He has neck pain all the time, and it goes to his head. On January 12, 2023, he had a cervical fusion. Before surgery, he felt tingling and numbness in his hands and arms. He will have another surgery in June. He had his first neck surgery in October 2020, and it did not help. He has pain in his back every day. He has one hand on his neck and one hand on his back. He gets electric shocks in his right leg and pain in both legs. He had back surgeries in 2016, 2018 and 2022 that did nothing. The surgery in August 2022 helped some but his pain is worsening. Sometimes standing is better than sitting and sitting is better than standing. He can walk 15 minutes. He can sit 15 minutes. He can lift a gallon of milk but there is neck pain. He can cook and go to the grocery store. He does not stay long. He turns down fishing trips daily. He does not go fishing with anyone.

(R. 23). After reviewing the medical evidence and other evidence in the record related to these complaints over the course of five pages of his decision, the ALJ found that claimant's statements were inconsistent with the record because they "exceed what the evidence of record can support." (R. 24). The ALJ observed that despite Plaintiff's statements, medical providers generally found he was not in acute distress despite claims of severe pain, he had full motor strength, often negative straight raise leg testing, and his reflexes and gait were typically normal. (R. 24-29, 520, 572-73, 580, 583, 587, 594, 610, 724, 814, 833, 835, 859, 872-73, 919, 939, 990, 1072, 1104-05, 2011, 2056-57, 2060, 2171, 2409, 2516, 2528, 2539, 2542-43, 2612-15). Plaintiff also generally denied numbness, tingling, weakness, gait disturbances, and other neurological problems throughout the relevant period. The ALJ also noted Plaintiff's own self reports of activities, including walking, jogging, and camping to partially discredit his subjective complaints.

Plaintiff argues that the ALJ improperly relied on a lack of objective evidence to dismiss Plaintiff's subjective complaints. Pl.'s Mem. (ECF No. 9, at 20). Additionally, Plaintiff contends that "the ALJ erred by concluding that [Plaintiff's] limited activities of daily living contradict a finding of disability." Pl.'s Br. (ECF No. 10, at 30). But, as described above, the ALJ

clearly enumerated all evidence he considered when making his decision. See 404.1545(a)(1), 404.1529(a). And these specific observations support the ALJ's decision to partially discredit Plaintiff's testimony, those subjective complaints were still relevant to determining Plaintiff's RFC. (R. 29) ("[T]he undersigned gave some deference to the claimant's subjective symptoms . . . in finding that the claimant is limited to less than a full range of sedentary work as set forth in the," RFC). In fact, the ALJ imposed a very restrictive RFC, concluding that Plaintiff could perform less than the full range of sedentary work— the lowest exertion level of work under the regulations. (R. 22). He also imposed additional non-exertional restrictions to account for Plaintiff's other impairments. Id.

Overall, reversal is not warranted simply because the record contains evidence which could support a conclusion different from the one reached by the ALJ. The court must defer to the ALJ's findings if they were reached by a proper application of SSA rules and are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is properly explained and supported

by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

### V.   **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court GRANT the relief requested in the Commissioner's Brief in Support of the Commissioner of SSA's Decision Denying Benefits and in Opposition to Plaintiff's Brief, (ECF No. 10), DENY the relief requested in Plaintiff's Brief in Support of Request for Review of SSA's Decision Under 42 U.S.C. § 405(g), (ECF No. 9), and AFFIRM the decision of the Commissioner.

### VI.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.   Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
September ⬚, 2024